This suit was filed by Paul Bourgere, Sr. and Mildred Nelson Bourgere, father and mother, respectively, of Paul Bourgere, Jr. who was struck and killed by a motor vehicle on the 26th day of May, 1944 near what is known as The Rendezvous Restaurant, approximately one mile north of the town of Napoleonville, Louisiana. Plaintiff alleges that the accident happened at about 9:30 P.M. while Paul Bourgere, Jr. was walking or standing on the shoulder of the paved highway which runs up and down Bayou Lafourche, on the left hand side thereof and at the time he was struck he was about three feet off of the pavement; that a truck and trailer belonging to the defendant, Bertoul Cheramie, operating as Morgan City Packing Company, was parked on the highway at an angle of forty-five degrees, with the front of the truck on the shoulder of the highway but with the rear of the truck and trailer on the paved portion of the highway; that there was not sufficient space for the passage of traffic on the highway between the rear of the truck and trailer and the opposite side of the said highway, the distance being less than nine feet; that this truck and trailer was facing toward Napoleonville, Louisiana, and was on the right side of the road; that said truck and trailer had no rear light and no flares were put out. *Page 132 
Plaintiff also alleges that a second truck and trailer loaded with lumber was proceeding along this highway in the direction of Napoleonville from Donaldsonville, Louisiana, which would also be in a southerly direction; that this lumber truck was owned by the Succession of Alonzo McCraney, operating under the name of the "McCraney Lumber Company, through Ethel Sitman McCraney, the Administratrix of the said Succession." Plaintiff then sets forth that this lumber truck was being driven at 55 miles per hour and that when it reached the proximity of the parked truck, it suddenly and without any warning whatever swerved across the highway on to the shoulder of the left side of the highway in order to avoid running into the rear of the parked truck and trailer belonging to the defendant Cheramie; that the driver of the lumber truck immediately swerved back on the paved highway but that this caused the rear end of the truck and trailer to swing out on the left hand shoulder and strike and kill Paul Bourgere, Jr.
Plaintiff also joined the Pennsylvania Casualty Company and the Massachusetts Bonding and Insurance Company as the insurers of Bertoul Cheramie, operating under the name of Morgan City Packing Company, and further alleged that the McCraney Lumber Company and/or Ethel Sitman McCraney carried public liability with the Massachusetts Bonding and Insurance Company.
Plaintiff Paul Bourgere, Sr., claimed damages for funeral expenses in the amount of $250.00; for mental pain and suffering, $5,000.00; loss of support and assistance, $5,000.00; and loss of love and affection and companionship, $10,000.00, or a total of $20,250.00. The mother, Mildred Nelson Bourgere's claim was identical except for the funeral expenses in the amount of $250.00.
The Pennsylvania Casualty Company filed an exception of vagueness and, in the alternative, an exception of no right or cause of action which resulted in the taking of testimony, and upon the trial it was shown by the Pennsylvania Casualty Company that it did not carry the insurance upon the truck of the defendant, Cheramie, involved in this wreck, and the Judge sustained the exception, dismissing the plaintiff's suit as to this insurance company. This ruling of the trial court was proper under the testimony and it is not contested on this appeal.
The defendant Bertoul Cheramie, operating as Morgan City Packing Company, filed a general denial and, in the alternative, plead contributory negligence on the part of Paul Bourgere, Jr., (a) "in running into the side of the truck and trailer (owner and operator unknown) after the truck and cab had passed the point on the shoulder where he had been standing;" (b) "In failing to observe any care or caution whatever in attempting to cross from the east to the west side of the road."
The defendants, Ethel Sitman McCraney, individually and as the Administratrix of the Succession of Alonzo McCraney, J. L. Martin, driver of the McCraney truck, and Massachusetts Bonding and Insurance Company, also filed a general denial in which they specifically set forth that the McCraney truck and trailer was not involved in the accident and, in the alternative, plead contributory negligence for the same reason as the defendant Cheramie, above quoted. These answers were filed on the 29th day of November, 1944.
On June 18th, 1945, the defendants secured an order for the plaintiffs to show cause why they should not be required to furnish security in the amount of $100.00 to cover the costs incurred in defending the suit. To this rule and order, plaintiffs excepted on the ground that the motion disclosed neither a right nor a cause of action and further set up that the defendants had no right to such a bond and denied all and singular the allegations contained in the motion. The minutes of June 26, 1945 state that the rule ordering "defendants" to show cause was refused, however, this was clearly an error and should have been a rule upon the "plaintiff" to show cause why bond should not be furnished. There is no doubt but that this minute entry refers to the rule under discussion. At any rate, it was properly refused. *Page 133 
The case was tried and the judge, with written reasons, dismissed plaintiffs' suit at their costs. Since the trial of the case, the plaintiff Paul Bourgere, Sr. died and the appeal was perfected to this Court on behalf of Mildred Nelson Bourgere as the widow of Paul Bourgere, Sr. and as the mother of the boy who was killed. At the beginning of the trial in the lower court, the plaintiff moved to have the defendants elect "as to which defense they would rely upon, since under the law and the Practice and Pleading Act one cannot plead contributory negligence until and unless his own negligence has been admitted." The judge of the District Court overruled the motion to elect and plaintiff is apparently reurging the motion as he has raised the point in his brief. The defendants filed a general denial and, in the alternative, plead contributory negligence which was the correct procedure, and the judge was therefore correct in denying such a motion.
The record discloses that on the night of May 26, 1944, at approximately 9:30, the truck of the defendant Cheramie was parked on the west or right side of the paved highway facing south and slightly south of a club known as The Rendezvous, which is about one or one and a half miles north of the town of Napoleonville. There is no testimony to sustain plaintiff's allegation that this truck was parked at an angle with the rear part protruding on to the highway, with no taillight and no flares and in such a position as to leave less than nine feet of space between the rear end of the truck and the edge of the pavement on the east or north lane of traffic. Plaintiff has utterly failed to prove this allegation. In fact, the only positive testimony is that the truck was parked facing south off of the paved portion of the highway and on the shoulder. This truck was used by the defendant Cheramie to come to Napoleonville and haul laborers for the Morgan City Packing Company, and it went as far as Belle Rose in order to pick up these laborers, and the driver, James Washington, testified that is what he was doing on this night at the time the accident actually happened. James Washington was in his truck and was just preparing to drive it off. He had stopped after being flagged and stated that "some boys" requested a ride and they were loading "in the back and one in the front," when the truck which struck young Bourgere passed by.
The testimony shows that young Bourgere was on the east side of the highway and intended to cross this highway to get in the defendant Cheramie's truck. The driver, James Washington, testified with regard to the actual accident and as to what kind of truck struck the boy as follows:
"Some boys asked me for a ride and they got loading in the back and one in the front and finally a trailer came by. When the trailer came by I noticed one of the boy's hat was flying from the window. I asked one of the boys what's that? He's hit! He said Paul's hit. He called the boys three times. He didn't come. One of the boys in the back came to the front and said: 'Mr. Jim, a trailer passed and hit little Junior. Finally I noticed it was a lumber truck. I stayed parked about 20 minutes or more. I left, I didn't see none of his people.'
* * * * * *
"Q. Did you tell him it was a truck loaded with lumber that had hit the boy? A. That's what the boy from the back told me.
* * * * * *
Q. Did you tell Mr. Cheramie what truck had hit the boy? A. A lumber truck, I told him.
"Q. Did you tell him to whom it belonged? A. What the man told me, I told him.
"Q. You told him it was a lumber truck? A. That's right; that's what I know."
The record does not disclose who told him it was a truck loaded with lumber that had hit the boy.
Another eyewitness, Taylor Parker, testified that a truck passed but that he did not know what kind because he didn't see it, but he knew it was a truck by the "run of it."
Eddie Carter, who was also a short distance away from Young Bourgere at the *Page 134 
time he was killed, testified he didn't know just what killed him but that he felt that it was a truck, and when asked what kind of a truck, he testified that it was a lumber truck. This is the only positive testimony that it was a lumber truck that was involved in the death of Paul Bourgere, Jr. There is no witness who testified that he could identify the truck or that it was a McCraney truck. None of them attempted to describe the truck.
There is also no witness who testified that the alleged McCraney truck swerved to its left to avoid striking the defendant Cheramie's truck. In view of the fact that there is no testimony to prove that the Cheramie truck was parked as alleged by plaintiff but, on the contrary, was properly parked off of the highway on the shoulder, there would be no reason and the testimony fails to reveal any other reason for the truck which caused Bourgere's death to swerve to its left.
It is most seriously disputed that the McCraney truck was the one which passed The Rendezvous at about 9:30 P.M. and caused the death of young Bourgere. The testimony as to this fact reveals that the McCraney truck No. 22 driven by the defendant J. L. Martin was loaded with lumber to be delivered at or near Morgan City, Louisiana; that at 9:30 P.M. the truck was at White Castle, Louisiana, at a gasoline filling station for the purpose of getting gas. This gasoline station was operated by Mrs. May Fontenot who testified that she usually closed at 9 P.M. and that on this particular night she had already closed up but that Martin, driver of the McCraney truck, asked her to serve him with gas. As he was a regular customer, she opened her station and at 9:30 P.M., after serving the customer, she was anxious to eat something and the restaurant closed at 10:00 P.M.; so at this time, 9:30 P.M., Martin was still at the station. She knew Martin well as he was a good customer and bought gas from her at least two or three times per week. She testifies positively that she knows it was 9:30 when she left the station and the truck had not yet pulled out. Martin, the driver of the McCraney truck, also testified that he left White Castle at 9:30; that he had asked "the girl at the station what time it was," as he noticed that she had a wrist watch on her arm. We believe that it is definitely established that this truck was at White Castle at this filling station at 9:30 P.M. If the allegations of plaintiff's petition are correct and the approximate time of the accident as fixed by the witnesses is also correct, which was about 9:30 P.M. or not later than 9:40 P.M., then it could not possibly have been the McCraney truck that was involved in the death of young Bourgere, as White Castle is shown by the record to be approximately 26 or 27 miles from the place of the accident.
Plaintiff contends that it has borne the burden of proof by such strong circumstantial evidence that it leaves no other hypothesis but that the McCraney truck killed Bourgere, Jr. Plaintiff contends that it has proven that there was no other lumber truck on this highway from the scene of the accident, The Rendezvous, to Morgan City other than the McCraney lumber truck. It is, therefore, most important that we analyze the testimony of the witnesses with a view of deciding as definitely as possible the exact time of the accident.
Counsel for plaintiff in his brief states that it has been fully established by the evidence "that he was killed on said date alleged; and at the place and approximately at the time shown in the petition — between 9:30 and ten minutes to ten." As stated, the petition alleges that the accident happened at 9:30 P.M. The father of the boy, Paul Bourgere, Sr., testified that it could have been about five minutes after ten, as near as he could remember, when he arrived at the scene of the accident, as he stated that he was waiting for the boy to come home at ten minutes before ten. This testimony, of course, is not very definite. However, he did testify on cross-examination that he knew it was not as late as 10:15 P.M. His wife, Mildred Bourgere, present plaintiff, testified that she thought it was around 9:00 or 9:30 that she went to the scene of the accident.
The witness Sam Klotz, who was with Miss Josie Schillaci on the night of May 26, 1944, testified that they were driving *Page 135 
up the highway north of Napoleonville when they saw the boy lying on the side of the road, and when asked what time that was, he testified between 9:00 and 10:00 P.M. On cross-examination, counsel sought to have him fix the time he arrived at the scene of the accident more accurately but his answer was, "It was around nine or ten o'clock, I am not positive because I did not look at the time." He was further asked if he knew how long after the accident he arrived at the scene and he testified, "They said it had just happened." This witness also testified that he was the first one there and he went for the doctor. "I got Dr. Roger and the coroner."
Klotz' companion, Miss Josie Schillaci, testified that she thought it was after nine o'clock but that she did not know the exact time. Both this witness and Klotz testified that the defendant Cheramie's truck was still parked on the opposite side of the road. The driver of this truck, James Washington, testified that after the accident he only remained about twenty minutes. This fact would corroborate these witnesses in their statement that they thought they had arrived just after the accident happened, for both saw the Cheramie truck still parked at the scene of the accident.
The eyewitness, Taylor Parker, was not asked by either counsel nor did he fix the time of the accident. Eddie Carter, another eyewitness, upon being questioned about the time testified, "I couldn't just exactly tell. I had no watch."
Dr. Charles Roger testified that he went to the scene of the accident; that he had no definite idea of the time he arrived there but he thought it was between seven and eight P.M. However, when he was told that all the witnesses fixed the time at between nine and ten p.m., he stated that probably it was, that he had no definite idea.
Mr. Ferdinand Richard, the Sheriff of Assumption Parish, testified that on May 26, 1944 at about a quarter to ten P.M. he was called, he believed by Sam Klotz, and told of the accident. He testified that he was called "immediately after the accident." The Sheriff's testimony is the most definite of all and while he testifies that he was called immediately after it occurred, it would almost be safe to assume that not less than five minutes had elapsed after the accident at the time he was called. We can assume that anywhere from five to fifteen minutes could be classed as "immediately." Be this as it may, if the accident happened at 9:30, 9:40 or 9:45, under the testimony in this case it would be impossible for the McCraney loaded lumber truck to have left White Castle at 9:30 and driven this twenty-six miles in fifteen minutes.
Should we assume that it was within the realm of possibility for the truck to have driven this distance in fifteen minutes, the testimony as to the speed of the McCraney truck is all to the contrary. The driver of the truck, J. L. Martin, testified that he averaged 32 to 34 miles per hour. It was agreed that his companion on the trip, Morris Lee Wahl, would testify to the same facts. Counsel for plaintiff in his brief states that the distance from White Castle to Morgan City was from 68 to 69 miles. He then has the following in his brief:
"Time: 9:30 Whitecastle;
11:30 Morgan City."
This statement alone fully corroborates the testimony of Martin, the driver of the McCraney truck, for if it took him two hours to go from White Castle to Morgan City, a distance of 68 miles, this would be an average of 34 miles per hour. This statement by counsel for plaintiff is also borne out by the testimony, except that Trooper Theriot testified that they stopped the McCraney truck at Morgan City "between 11:30 and 12 — about 20 minutes to 12," while State Trooper John Crispino testified that they stopped the truck in Morgan City, "in the neighborhood of 12 or 12:30 — exact time, I don't remember." Regardless of the slight discrepancy in the testimony of the troopers as to the time, it still would be corroborative of Martin's testimony that he was driving at an average of about 34 miles per hour.
While it would seem that this should be a sufficient discussion of the facts to show that the McCraney truck was not the truck involved in the accident at The Rendezvous *Page 136 
at 9:30 P.M., there are additional reasons as shown by the testimony which exonerate the McCraney truck. The Sheriff testified that he lived in Labadieville, which is a distance of nine miles from Napoleonville and, therefore, ten or ten and a half miles from The Rendezvous, the scene of the accident. He testified that within two minutes after he got the call he was out in front of his house on the highway, hoping to stop the lumber truck that had struck Paul Bourgere, Jr. He remained in front of his house "maybe ten minutes," and then he went into his home and called Thibodeaux and had the night watchman watch the road in order to stop the lumber truck. According to the record, Thibodeaux is approximately 25 or 26 miles from Napoleonville. The Sheriff then got in his car and went to Thibodeaux, and the night watchman there told him the truck had not passed.
In plaintiff's brief, he makes a statement that the nine miles between Napoleonville and Labadieville had already been negotiated by the truck before the sheriff reached the road, and he has a table of time in which he estimates that from the time the truck was involved in the accident at The Rendezvous to the time the Sheriff got on the road would be ten to eleven and a half minutes. Therefore, he says the truck negotiated the ten to ten and a half miles from The Rendezvous to Labadieville in ten to eleven and one-half minutes, which would be approximately sixty miles per hour. This could be possible, but, under the facts, the McCraney truck could not have been at these points at that time, aside from the fact that there is no testimony to show that the McCraney truck ever traveled sixty miles per hour from White Castle to Morgan City. It seems more than likely that if a loaded lumber truck struck this boy at The Rendezvous ten to eleven and one-half minutes prior to the time the Sheriff actually got on the highway, that the truck would have been seen or stopped by the Sheriff. This truck had to go through the town of Napoleonville and it is more than reasonable to assume that it would have slowed down for street entrances into the highway.
Some of the witnesses to the accident testified that they did not think that the driver of the truck that struck the boy even knew that it had happened, as the entire front portion of the truck, the lights and cab, had passed the boy and he was struck or ran into the trailer part of the motor vehicle. Therefore, there would be no reason for the driver to be running away from the scene of the accident and normally he would have slowed down for the town of Napoleonville.
While counsel for plaintiff contends that "Since Sam Klotz did not meet the truck between Napoleonville and The Rendezvous it shows that he had already negotiated the distance of one and one-half miles to Napoleonville." The testimony of Sam Klotz on this point under direct examination by counsel for plaintiff was as follows:
"Q. You are positive you didn't meet a lumber truck? A. Not positive. I met plenty of traffic, but don't know what they were in the nighttime. I don't know."
His companion, Miss Josie Schillaci, testified that she did not remember meeting a lumber truck between Napoleonville and The Rendezvous. There is no testimony as to how many roads lead off from the highway between The Rendezvous and Napoleonville or between The Rendezvous and Labadieville, and certainly the evidence would indicate that the truck that struck Paul Bourgere, Jr. evidently did not go as far as Labadieville or it would have been stopped or seen by Sheriff Richard. However, assuming that it did negotiate the ten to ten and one-half miles in ten to eleven and one-half minutes, it certainly could not have passed the blockade at Thibodeaux, for, according to Sheriff Richard's testimony, he received the call at 9:45 P.M., took two minutes to get on the road, and stayed on the road ten minutes, when he went back into his house and called Thibodeaux, which would have been at three minutes to ten P.M. Under these facts, the truck would have had to negotiate the sixteen miles from Labadieville to Thibodeaux in ten to fifteen minutes. Otherwise, it would have been seen or stopped at Thibodeaux by the night police. *Page 137 
While all of the testimony, positive or circumstantial, refutes the contention of the plaintiff that the McCraney lumber truck was at The Rendezvous at 9:30 or 9:40 P.M., all of the testimony is to the effect that the McCraney truck was not traveling sixty or seventy miles an hour but took two hours to travel sixty-eight miles, as was testified to by the driver of the truck and his companion. If we assume that the McCraney Lumber truck was at White Castle at 9:30 P.M., which is definitely established by the testimony, and that it traveled at approximately 34 miles per hour, it would have reached The Rendezvous, a distance of some 26 miles, in approximately 47 minutes or about 10:17 P.M., which would appear to be borne out by the testimony for the reason that the testimony leads us to believe that at this time the body had been picked up and Paul Bourgere, Sr. and Sam Klotz were in Schillaci's Restaurant and Bar at Napoleonville, Louisiana. Paul Bourgere, Sr. testified that he remained at the scene of the accident about thirty minutes, and Sheriff Richard testified that he came from Thibodeaux to Labadieville, his home, and called Franklin, Louisiana, about 10:20 P.M. This is the approximate time the State Troopers testified they were notified from Franklin, Louisiana, to look out for a lumber truck. Sheriff Richard then went to Napoleonville, a distance of nine miles only and, according to his own testimony he was driving fast that night, where he met Paul Bourgere, Sr. and Sam Klotz at Schillaci's Restaurant and Bar. It would, therefore, be within the bounds of reason to assume that while Sheriff Richard was talking to Bourgere and Koltz at Schillaci's the McCraney truck went through Napoleonville. Further, Martin, the driver of the McCraney truck, testified that he did not see any truck parked on the side of the road at The Rendezvous (meaning the Cheramie truck driven by James Washington) nor did he notice any crowd of people or anything unusual when he passed. James Washington, driver of the Cheramie truck, testified that he remained at the scene of the accident approximately twenty minutes after it happened. Therefore, he had left prior to the time the McCraney truck arrived at The Rendezvous. While it is not definitely stated at what time the undertaker picked up the body of Paul Bourgere, Jr., we believe that this had been done prior to the time the McCraney truck passed The Rendezvous, else someone would have been watching the body and would most assuredly have seen this loaded lumber truck.
As to why the night officer at Thibodeaux did not see the McCraney lumber truck, we are unable to explain other than he must not have stayed on the road at all times. Also unexplainable is the fact that Sheriff Richard, after talking to Paul Bourgere, Sr. and Sam Klotz at Schillaci's Restaurant and Bar in Napoleonville, staying there about twenty minutes, then left and went to Morgan City, traveling the Chacahoula Cut Off which is the same route taken by the McCraney Lumber Company truck on its way to Morgan City, and the Sheriff came back this same route and did not see the McCraney Lumber Company truck, either coming or going. As he walked in his house after his trip to Morgan City, he received a phone call about 12:15 A.M. from Franklin., Louisiana, to the effect that they had arrested Martin, the driver of the McCraney Lumber truck. It is impossible to explain from the testimony why the Sheriff did not see the McCraney lumber truck on his trip, regardless of whether this truck passed Labadieville just before he got on the highway after being notified, or whether it passed through Napoleonville at the time he was in Schillaci's Restaurant, for the truck, according to the testimony of the State Troopers, was stopped at twenty minutes to twelve, or around 12:00 or 12:30, and the Sheriff made the trip to Morgan City and back to his home by 12:15. Therefore, he was bound to have passed this truck somewhere, else one or the other had turned off the road or stopped off the side of the road and was not seen at the time the other passed.
It is also in evidence that the McCraney truck was examined by two State Troopers, Sheriff Richard and one of his deputies, and there was no evidence on it that it struck Paul Bourgere, Jr. *Page 138 
We are therefore of the opinion that the plaintiff has failed to prove that the McCraney Lumber Company truck was the truck involved in the accident in which Paul Bourgere, Jr. was killed.
We think it best to also discuss the plea of contributory negligence or the liability of the defendants, if the McCraney Lumber Company truck, for the sake of argument, was the one which was involved in the accident. All of the defendants plead contributory negligence on the part of Paul Bourgere, Jr., who was sixteen years of age at the time of his death.
James Washington, the driver of the defendant Cheramie's truck, testified that he was properly parked on the shoulder of the road, near The Rendezvous, which is a night club located approximately one or one and a half miles north of Napoleonville; that he was engaged in picking up laborers for his employer as far as Belle Rose, Louisiana, that being what he was doing on this night. He testified that some of "the boys had flagged me" and he had stopped facing south on the west shoulder of the paved highway running along Bayou Lafourche. It will be noted that in his testimony which has been previously quoted, one of the boys in the back of his truck came to the front and told him, "Mr. Jim, a trailer passed and hit little Junior." (Emphasis ours.) It is somewhat significant that the boy used the word "trailer" rather than truck, for we believe the testimony clearly shows that it was the trailer part of the truck that came in contact with Paul Bourgere, Jr. and caused his death.
Plaintiff has introduced two maps in evidence, however the witnesses practically destroyed the effect of these maps, for one did not know how to write and therefore, we do not believe he could have drawn a map, and the other one could barely sign his name and denied drawing the important and damaging parts of the map; therefore, these maps may be disregarded as being of no probative value.
Paul Bourgere, Jr. fell with both of his legs on the pavement and his head off the pavement and was lying face down. Dr. Roger testified that it seemed to him that the body was lying face down on the shoulder of the road and that he died of "multiple cranial injuries and what seemed to be compound fracture of the thighs, — as to which I don't have recollection." Dr. Roger's testimony is rather vague and we therefore accept the testimony of James Washington that Paul Bourgere, Jr. was lying with his legs on the pavement and the rest of his body on the shoulder face down. However, the injuries were mostly to the right side.
Taylor Parker, who was an eyewitness, testified that he was working at The Rendezvous and just before Paul Bourgere was killed, he asked Parker for a cigarette and after he gave him the cigarette, "he ran on the side of the road. He dropped the cigarette and turned around, went on the side and a truck passed. After the truck passed, I didn't see him no more." He further testified that after the lights of the truck had passed and got off him (meaning the deceased, Paul Bourgere, Jr.) he didn't see him any more. He testified that he didn't notice which side of the road the truck passed on.
The testimony of Eddie Carter, who was at The Rendezvous restaurant the night the accident occurred, was to the effect that he was out in front when Paul Bourgere came by his car and asked him for a cigarette; that he had none and he saw Bourgere when he went over and asked another colored boy named Taylor for a cigarette; that when Taylor gave him a cigarette "he left out from the Rendezvous at a slow trot. He was coming down the Bayou, running on the side of the road, and while he was running, I was not even paying attention to him, but the woman I was with called my attention to it, she said: 'That boy's going to get killed'. I looked slightly back, he was running slow. Just as the truck was passing him, he motioned over, but what happened then I don't know, but at that time I hear he was dead." This witness further testified as follows:
"Q. When the truck was coming, Paul was still running, just about when Paul got to where Jim's gadabout was, and just when the headlights were passing Paul, you could see Paul motion towards the other side of *Page 139 
the road? A. Like he started for to cross; the truck passed; I could see him until the headlights passed him, then I could see him go towards the road.
* * * * * *
"Q. I thought you told me you had not seen him? A. I told you I seen him until. the headlights passed him.
"Q. Then if he had continued with his motion when the headlights were still upon him, he would have been in front of the truck? A. I don't know.
"Q After the headlights passed, you didn't see him any more? A. No, sir. I seen him when the headlights were on him, I said to myself he intends to go across the road. The last I see, he was still on the shoulder of the road; he was already propped to go across the road.
"Q. You didn't see him cross the road? A. No, sir.
"Q. You didn't see him on the pavement? A. No, sir.
"Q. After the truck passed, he was on the pavement dead? A. Yes, sir, when we got there he was lying dead on the pavement."
This is the main testimony with regard to the accident itself, the position of the body and the injuries which caused the death of Paul Bourgere, Jr. It is proven that the Cheramie truck was properly parked off of the highway, therefore there would be no reason for the truck driving south and which was involved in the accident to have swerved to its left or to have left its own lane of traffic, and there being no testimony in the record that the truck did swerve out of its lane of traffic, we see no reason why we should not assume that it did not do so. Taking the testimony of the eyewitnesses, we are of the opinion that this boy was extremely negligent in that he intended to cross the highway to get into the Cheramie truck and as soon as the headlights and main body of the truck itself had passed him, he ran into the side of the trailer which would naturally have injured his right side as the truck was traveling south, and this is the side that would have received the blow, and, as a result of the blow, it knocked him back across the east lane of traffic where he fell with his legs on the pavement and the rest of his body on the shoulder.
We are therefore of the opinion that the judgment of the District Court is correct and that it should be affirmed and it is so ordered, plaintiff to pay all costs.